THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE NEW YORK EDISON COMPANY, Appellant, *v.* PUBLIC SERVICE COMMISSION FOR THE FIRST DISTRICT OF THE STATE OF NEW YORK and TRAVIS H. WHITNEY and Others, as Commissioners Thereof, and ACKER, MERRALL & CONDIT COMPANY, Respondents.

First Department, March 19, 1920.

Gas and electricity — public service corporation manufacturing electricity cannot be compelled to furnish current to private customer for resale as competitor — jurisdiction of public service commission.

The Public Service Commission has no jurisdiction to compel a public service corporation which makes and sells electric current to furnish "break-down service" (or current to be used in an emergency) to a consumer who maintains a private electrical plant for its own use and for the use of its tenants so as to enable such consumer to sell the "break-down service" to other persons in the vicinity who are not its tenants, thus enabling the consumer to compete with the public service corporation, it appearing that said corporation is willing to furnish break-down service for the benefit of said consumer and its tenants.

CERTIORARI issued out of the Supreme Court and attested on the 3d day of February, 1919, directed to the Public Service Commission for the First District of the State of New York

and Travis H. Whitney and others, as commissioners thereof, and another, commanding them to certify and return to the office of the clerk of the county of New York all and singular their proceedings had in requiring the relator to furnish break-down service to Acker, Merrall & Condit Company in the city of New York.

The opinion of the Commission is reported in *Acker, Merrall & Condit Co.* v. *N. Y. Edison Co.* (18 State Dept. Rep. 113).

*Nathan L. Miller* of counsel [*Thomas H. Beardsley* with him on the brief], *Beardsley, Hemmens & Taylor,* attorneys, for the relator.

*Terence Farley* of counsel [*Ely Neumann* with him on the brief], for the respondent Public Service Commission.

*Edwin L. Kalish* of counsel [*Kalish & Kalish,* attorneys], for the respondent Acker, Merrall & Condit Company.

SMITH, J.:

Acker, Merrall & Condit has a grocery store and owns a building which it partly occupies and part of the building is occupied by its tenants. It has a private plant which generates electricity which it uses in its own store and sells to its tenants. It also sells electricity to other customers in the same block. It has applied to the relator to serve to it what is called break-down service. The relator is willing to furnish such break-down service to Acker, Merrall & Condit for its own use and for the use of its tenants on condition that Acker, Merrall & Condit will not use that service for the benefit of its customers in other buildings in the same block. The Public Service Commission has directed the relator to furnish such service without any stipulation to confine the use of the same to itself and its tenants. This break-down service is primarily a service for emergency. It is used in case the service of the customer breaks down. It is used also when very little electricity is required as upon holidays and Sundays and also at the peak of the service when a maximum current is required during the day. It is an important service to those furnishing their own electricity because it saves the expense

of emergency equipment. It saves the necessity of stronger equipment which will always furnish enough electricity for whatever the demands may be, and enables the owner of the private plant to use the electricity of the relator when it is unprofitable to operate the private plant by reason of the small amount of electricity used in certain times of the day and in certain times of the year. For all these emergencies the relator as a public service corporation must be prepared, and the electricity must be furnished at all times of day or night and on all days of the year, whether or not the amount used makes such service profitable to the relator. It enables an owner of a private plant to furnish the most of the electricity required by its tenants and its outside customers at a cheaper rate, and Acker, Merrall & Condit are furnishing electricity not only to its tenants, but to others in the same block at fifteen per cent less than the scheduled rates of the relator. The relator contends that in furnishing to those outside of its own tenants, Acker, Merrall & Condit is a competing company and, therefore, the relator should not be required to furnish to it break-down service, by which it is enabled to cut the price and sell for a less sum to those outside of its own building, although within its own block. If the furnishing of this service were required only as to this particular customer, the inequality would be slight, but there are 600 and more private plants in the city of New York, and if this order is sustained, there is no reason why a private plant cannot be installed in every block in the city of New York and electricity furnished therefrom at fifteen per cent less than the scheduled rates of the relator, and the relator be required to furnish the auxiliary service for these emergency cases which costs more to them than the regular service because of the extra equipment necessary in order to be prepared to give this emergency service.

In *Matter of Break-down Service* (1 P. S. C. Rep. 1st Dist. 130), break-down service is defined: " The service which an electricity supply company renders when it provides a ' connection ' between its system and the installation of a consumer having his own electric plant, and agrees to stand ready to supply such consumer with current whenever his plant actually breaks down in whole or in part. As currently used, however,

the term includes two other kinds of service: *First*, the service rendered by the supply company to the owners of private plants (both readiness-to-serve and current) during nights, Sundays, holidays and perhaps longer periods when only a small amount of current relatively is demanded; *second*, a like service rendered by the supply company to owners of private plants during the peak period of the day — usually about 5 P. M.— when the consumption of current reaches its maximum for the day.    These two classes of service are quite different and distinct from pure break-down service; they are really auxiliary service; but in common usage the three classes are included in the single term ' break-down service.' "

In that case the Commission held that the relator must supply such service to private plants and said: " The private electric plants are not competitors, for they do not distribute current beyond their own premises."

In *Matter of Frankel Brothers* v. *New York Edison Co.* (4 P. S. C. Rep. 1st Dist. 272) the Commission held that relator was not obliged to supply auxiliary service to an electric plant, desiring to sell current to outside customers in competition with relator.    The opinion in part reads:

" It appears in this case that the complainants took a customer away from the Edison Company and are supplying that customer at rates fifteen per cent below the company's rates. It is conceivable that private plants, one in each block, might thus secure a considerable part of the business which is now conducted by the Edison Company;    *    *    *.

" When we required the companies to establish break-down service, including under the one title supplemental and auxiliary service as well, the Commission realized that it would be possible for a customer to shut down his own plant when most expensive for him to operate and switch on Edison service. But it was not contemplated that advantage would be taken of this action to require the Edison Company to supply emergency or auxiliary service *to a competing company.*    *    *    *

" Now, admittedly, there are some points of similarity between a company supplying electricity generally and a person who has his own private plant, and between these two stand the block plant and the person supplying adjoining buildings which he does not own or rent.    But the line must be drawn

somewhere, and it seems reasonable to differentiate the company doing a general business, the block plant and the person selling current to persons outside of his own premises from the person who merely manufactures current for his own use and that of his tenants. This line of demarcation is recognized by the Public Service Commissions Law. It defines an electrical corporation as a ' corporation * * * owning, operating or managing any electric plant except where electricity is generated or distributed by the producer solely on or through private property for railroad or street-railroad purposes, or for its own use or the use of its tenants and not for sale to others.' "

In the case of *People ex rel. Perceval* v. *Public Service Commission* (163 App. Div. 705) it was held that where a person purchases electricity from a private plant which did not furnish night service, that person might have a breakdown service from the public service corporation. It is claimed by the relator here in distinguishing that contract that in that case the fact of competition was not established. There a plant was installed under a mutual working arrangement between the lessees of two buildings, which plant was intended to serve both buildings. The two buildings only were supplied by the private plant. Moreover, it was in that case the purchaser of the electricity and not the owner of the private plant that was making the application. In the case at bar, however, we have the bald proposition as held by the Public Service Commission, that one with a private plant may sell to any other consumers in the same block, and can call upon the public service corporation to furnish this breakdown service, thus enabling it to sell more cheaply than can the relator, the most of the electricity used by these customers. It is true that a schedule of rates might be fixed by the relator for this break-down or emergency service that would compensate the relator for the extra cost involved, but the proposition remains that this relator has by the order sought to be reviewed been compelled to assist a competitor to entice away its customers, and such an order, as I read the decisions, is not authorized except under statutory direction.

In *People ex rel. New York Edison Co.* v. *Willcox* (207 N. Y.

242   People ex rel. N. Y. Edison Co. *v.* Pub. Serv. Comm.

First Department, March, 1920.                [Vol. 191.

94) it is held that the Public Service Commissions Law " provided for a regulation and control which were intended to prevent, on the one hand, the evils of an unrestricted right of competition and, on the other hand, the abuses of monoply."

In *People ex rel. Cayuga P. Corporation* v. *Public Service Comm.* (226 N. Y. 527) the opinion in part reads: " The corporation, in the words of the certificate, was ' to generate and distribute electricity solely on or through private property for railroad or street railroad purposes, or for its own use or the use of its tenants.' The effect of this abdication of public functions was to withdraw the corporation, as thus organized, from the jurisdiction and supervision of the Public Service Commission." With the assumption of a public function and in supplying electricity to outside consumers other than its tenants, then Acker, Merrall & Condit is a competitor of relator and has only the rights of such competitor in making its demand.

In *Evansville & H. Traction Co.* v. *Henderson Bridge Co.* (134 Fed. Rep. 973) it is said: " One water company, or one telephone company, or one telegraph company, or one street railway company, or one railroad company while bound appropriately to serve the general public, cannot, unless under express statutory enactment, and by due process of law thereunder, be compelled to give its property to the uses and benefits of a rival except by some form of condemnation. The rival is not ordinarily to be included in the term ' general public.' "

And in Elliott on Railroads [2d ed.] it is said (§ 922): " So it is said that ' while a public service corporation, like a railroad company is bound to render to the public certain services appropriate to its particular functions, it is not bound to permit its property to be subjected to use by a rival corporation unless by express statutory enactment and by due process of law thereunder.' "

In *People ex rel. Oneida Tel. Co.* v. *Central N. Y. Tel. & Tel. Co.* (41 App. Div. 19) the court said: " It is foreign to the purpose of the act to permit another corporation, under pretense of using the line of its rival for purely private business, to use it to absorb the very business and profit to which it was intended simply to permit it to contribute upon the same footing as an individual.

"Assuming that it is the duty of the defendant company to

render the like service to the relator as to an individual, it is plain that the relator here seeks by mandamus to compel the defendant to render much more than the like service; it seeks an inequality of advantage under pretense of equality. The difference is not merely in degree but in substance and result."

In that case one telephone company sought to compel another telephone company to transmit messages not only of the telephone company itself, but of the customers of that company. In that case it was further said: "*No doubt the defendant company could have made regulations limiting the relator to its individual business, excluding that of its customers.*"

Further authority is found in *People ex rel. Postal Tel. Cable Co.* v. *Hudson R. Tel. Co.* (19 Abb. N. C. 466); *Oregon Short Line & U. N. R. Co.* v. *Ilwaco R. & N. Co.* (51 Fed. Rep. 611); *Central Stock Yards* v. *Louisville, etc., R. Co.* (192 U. S. 568); *Home Tel. Co.* v. *Sarcoxie Light & Tel. Co.* (236 Mo. 114; 139 S. W. Rep. 108); *Pacific Tel. & Tel. Co.* v. *Anderson* (196 Fed. Rep. 699, 702); *Public Service Corp.* v. *American Lighting Co.* (67 N. J. Eq. 122); *American Lighting Co.* v. *Public Service Corp.* (132 Fed. Rep. 794).

But it is said that the relator is furnishing a similar service to other corporations under like circumstances and, therefore, cannot discriminate against Acker, Merrall & Condit, the petitioner before the Public Service Commission. The first case called to the attention of the court is the case of the United Electric Light and Power Company, a public service corporation. But it was shown that that was not a rival company, but a company whose stock was owned by the same company that owns the relator's stock and was, therefore, entirely without the rule here stated. Furthermore, one company furnishes an alternating current and the other a direct current. They do not cut rates or otherwise compete, and all their profits go to the common owner of the stock of both companies. The next case cited is Best & Co. This company resells to other companies electricity which it purchases from the relator company at the regular rates. Best & Co. has no private plant of its own. It is not as is the case with Acker, Merrall & Condit, underselling the relator, and is not in competition with the relator, because all of the electricity sold

244   People ex rel. N. Y. Edison Co. *v.* Pub. Serv. Comm.

First Department, March, 1920.     [Vol. 191.

by Best & Co. is purchased from the relator. The third case is the sale to one Salmon. That sale is under what is known as the conjunctional rate schedule. In that case Salmon has no private plant. All of the electricity is purchased from the relator and is furnished to the owner of two buildings by Salmon who is the owner or lessor of the two buildings within 100 feet of each other and capable of service from one connection. It is a class of service offered to all who come within the limits of the class and is in no way in competition with the relator. The fourth case is the Perceval case before stated, where the customer made application and not the owner of the private plant who was selling his service, and where the owner of the private plant was held not to be a competitor.

The evidence in the case by the witness Moses who has charge of this plant for Acker, Merrall & Condit, and who is in some way financially interested therein, is to the effect that there is no other case where break-down service is furnished to the owner of a private plant which is in competition with a public service corporation. It thus appears that in refusing to Acker, Merrall & Condit this break-down service, the relator was guilty of no discrimination, inasmuch as similar service was not given to any other customer under like conditions. Inasmuch as Acker, Merrall & Condit was a competing company the relator cannot be compelled in the absence of an express statutory requirement to furnish to them this break-down service for the purpose of sale to outside customers.

I have not referred to the contention of the relator that, because the petitioner is selling electricity to customers other than its tenants, it is an electrical corporation and subject to the supervision of the Public Service Commission and having failed to conform to the requirements of that law it has no standing in court to ask the interposition of the Commission. But this question it is unnecessary to decide. Whether or not the petitioner is an electrical corporation coming within the supervision of the Public Service Commission, it is perfectly clear that the statute intended to make a distinction between those corporations which were manufacturing gas or electricity for their own purposes, or the purposes of their tenants, and those who went further and assumed to sell their gas or electricity

to outsiders. The main significance of that distinction would seem to be that while it is engaged in selling electricity to outsiders other than its own tenants, it has not the rights of the public to demand service upon payment of the legal rates, but it has only the rights that one public service corporation has as against another, which seems to be settled by the authorities cited and does not include the right to demand service of a competing company for the purpose of enabling the petitioner to undersell that competing company and take away its customers.

The determination should, therefore, be reversed, with fifty dollars costs and disbursements to the relator.

CLARKE, P. J., DOWLING and PAGE, JJ., concur.

Determination reversed, with fifty dollars costs and disbursements. Settle order on notice.